UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
(FORT LAUDERDALE DIVISION)

In re

AMERICAN TELNET, INC.,

   Debtor.

_____/

CHAPTER 7

CASE NO. 07-11430-BKC-JKO


KENNETH WELT, Chapter 7 Trustee
of Debtor AMERICAN TELNET, INC.,

   Plaintiff,

vs.

MICHAEL PARDES, an individual, TED
LIEBOWITZ, an individual, SARA
LIEBOWITZ, an individual, and
GAVIN KAHN, an individual,

   Defendants.

_____/

ADV. NO.  08-01824-JKO

**TRUSTEE'S STATEMENT OF FACTS NOT SUBJECT TO GENUINE DISPUTE
IN SUPPORT OF HIS SUMMARY JUDGMENT MOTION**

  Plaintiff Kenneth Welt ("Welt" or the "Trustee"), not individually but in his

capacity as the Chapter 7 trustee of the bankruptcy estate of American Telnet, Inc. ("American

Telnet" or the "Debtor"), on behalf of the estate and its creditors, hereby submits his statement of

facts not subject to genuine dispute in support of his motion for summary judgment pursuant to

Fed.R.Civ.P. 56 made applicable to this proceeding pursuant to Bankr.R.Civ.P. 7056 against

Defendants Michael Pardes ("Pardes"), Ted Liebowitz ("Liebowitz"), Sara Liebowitz ("S.

Liebowitz") and Gavin Kahn ("Kahn").

  1. American Telnet was founded  in 1992.  *See, e.g.,* Exhibit 2 at p. 2.

2.      During its existence, American Telnet was one of the largest providers of "audiotext" services or audio entertainment services offered over the telephone. "Audiotext" services include audio information or audio entertainment, access to simultaneous voice conversation services, and any service involving the provision of a product that are accessed over the telephone by dialing 800 and 900 numbers.  The services provided by American Telnet primarily supported  the adult phone sex business but also included other entertainment services such as psychic and horoscope hotlines.  *See, e.g.*,  Exhibit 1, excerpts of the deposition of Pardes taken on June 1, 2005 at p. 5; Exhibit 3, excerpts of the deposition of Michael Pardes taken on September 22, 2010, at p. 7; Exhibit 4, excerpts of the deposition of  Howard Markowitz taken on January 25, 2005, at p. 7; *see also* Exhibit 2 at pp. 1-2.

3.      For much of its existence, American Telnet was a lucrative business. *See, e.g.,* Exhibit 2 at p. 2.

4.      In 1997, Liebowitz filed an arbitration proceeding against Pardes and others contending, *inter alia*, that Pardes and the other respondents were preventing him from obtaining access to the books and records of American Telnet and were withholding salary and distributions owed to him. Exhibit 5.  Importantly, at no time during the arbitration did Liebowitz make any claim or even reference the existence of a joint venture with Pardes concerning ownership of phone numbers.  *Id.; see* Exhibit 2.  In the arbitration, Liebowitz admitted  that he had been convicted of two felonies, including the filing of a false document, but claimed that his partner too "was no babe[] in the woods." Exhibit 2 at p.2; *See* excerpts of the deposition of Ted Liebowitz, taken on October 14, 2010, which is attached as Exhibit 6, at pp. 40-41.  The parties thereafter entered into a memorandum of understanding to settle the arbitration. *See* Exhibit 7.  The memorandum does not mention any joint venture to own

Carlson & Lewittes, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

telephone numbers.

      5.    Pardes was at all relevant times an officer, member of the board of directors and a shareholder of American Telnet. Exhibit 1 at p. 28; Exhibit 7.  Subsequent to the 1997 arbitration, Pardes held the office of President and Chief Operating Officer of American Telnet.  Exhibit 7 at par. 9.  He held 39 shares of American Telnet stock representing 39% of the company (*see, e.g.,* Exhibit 8) until the completion of a litigation commenced by disgruntled shareholder William Rivell in 2003, at which time Pardes' ownership interest in American Telnet increased to 40 shares or 40% of the company because of the buy back of Rivell's shares.  *See, e.g.,* Exhibit 9 (Liebowitz and Pardes together owned 94% of the company in February 2004).

      6.    Liebowitz was at all relevant times an officer, member of the board of directors and a shareholder of American Telnet.  Exhibit 7.  Subsequent to the 1997 arbitration, Liebowitz held the office of Chief Executive Officer and Chairman of the Board. *Id.* at par. 9. He held 53 shares of American Telnet stock representing 53% of the company (*see, e.g.*, *Id.* at par. 10 and Exhibit 8) until the completion of the Rivell litigation at which time Liebowitz' ownership interest in American Telnet increased to 54 shares or 54% of the company because of the buy back of Revill's shares. *See, e.g.,* Exhibit 9 (Liebowitz and Pardes together owned 94% of the company in February 2004).

      7.    S.  Liebowitz, Liebowitz' wife, was at all material times, a director of American Telnet. *See* excerpts of the deposition of Gavin Kahn, taken on November 22, 2010, which is attached at Exhibit 10, at p. 50; Deposition of S. Liebowitz taken on September 20, 2011 which is attached as Exhibit 68 at p. 6.  She was at all material times a house wife and had no involvement with the business of American Telnet other than being a director. Exhibit

68 at pp. 6, 8; *see* Exhibit 10 at p. 50 (Kahn did not think S. Liebowitz was included in discussions related to American Telnet); Exhibit 1 at p. 25.  S. Liebowitz could not recall anything she did as a director. Exhibit 68 at p. 19.  The only thing she recalled is that she had a conversation with her husband about taking out a loan.  *Id.* at pp. 25-26. Her husband told her that without a loan the business would go into bankruptcy. *Id.* at pp. 14-15. She approved the loan not as a director but rather "like a husband and a wife" and took her husband at his word without any further investigation on her part. *Id.* at pp. 18, 21. She could not recall attending any board of director meeting in person by telephone or otherwise; voting on any matter as a board member; providing a written consent in lieu of meeting of the board of directors; reviewing any of American Telnet's books or records; asking any questions about the business affairs of the corporation; or inquiring into the financial condition of the business. Id. at pp. 18-21. She never spoke to American Telnet's accountants, lawyers, Chief Financial Officer, or in-house counsel. *Id.* at pp. 17, 20. Though designated as a director,  S. Liebowitz did not keep herself informed about the business affairs of American Telnet. *Id.* at pp. 18-19, 26.

8.      Kahn is a lawyer and has been a member of the Florida Bar since 1993. *See* Exhibit 10 at p. 8.  He was the American Telnet's in-house general counsel and Vice President of Legal and Corporate Affairs at all material times until he was terminated and entered into a release agreement with American Telnet on or about November 14, 2003.  *Id.* at pp. 12, 55-56;  Exhibit 7 at par. 15.  In connection with the release agreement, Kahn obtained the personal guarantees of Liebowitz and Pardes with respect to payment of his severance benefits.  *See* Exhibit 25.

9.      Howard Markowitz ("Markowitz") was at all material times the Chief Financial Officer, a member of the board of directors, and a shareholder of American Telnet.

Markowitz was a five percent (5%) shareholder of American Telnet.  *See* excerpts of the

deposition of Howard Markowitz taken on November 10, 2010, which is attached as Exhibit 11

at pp. 8, 12, 128-29; *see also* Exhibit 6, excerpts of the deposition of Ted Liebowitz at p. 59.

10.     At all material times, Leonard Sandler was a one percent (1%)

shareholder of American Telnet.  Exhibit 6, excerpts of the deposition of Ted Liebowitz at p.

59; Exhibit 8.

11.     At all material times, Nelson Braff was a member of the board of

directors of American Telnet. *See* composite Exhibit 12; Exhibit 1 at p. 25.

12.     In 1998, William Rivell Jr. ("Rivell"), who was an employee and a

shareholder holding two percent (2%) of the stock of American Telnet, left the company.

Exhibit 6, excerpts of the deposition of Ted Liebowitz at p. 59; Exhibit 8.

13.     On October 10, 2002, Rivell commenced an action against American

Telnet, Pardes, Liebowitz and others alleging, among other things, that American Telnet and its

officers and directors had purposely diverted income and revenues of American Telnet to other

companies they had formed to prevent Rivell from collecting distributions due to him as a two

percent (2%) shareholder of the American Telnet.  A copy of the complaint filed by Rivell is

attached as Exhibit 13.

14.     Akerman Senterfitt LLP ("Akerman"), American Telnet's outside

counsel, took the following notes on October 18, 2002: "Rivell left to compete, as a result, the

new companies were created to cut him out of $. The revenues are no longer in American

Telnet–they are in the new related companies." *See* Declaration of Jon Stage, Exhibit 14 at par.

3 and Exhibit A thereto.

15.     In further discussions on October 31, 2002, Akerman had a conversation

with Kahn, American Telnet's in-house counsel. Id. at par. 4.  In connection with such

discussions, Ackerman took the following notes: "American Telnet has assets but minimal

income.  The income is derived from other companies.   This was done intentionally b/c

[because] of Rivell but 'that won't be admitted.'" *Id.* at Exhibit B.[1]

      16.     In connection with the Rivell litigation, American Telnet provided

Akerman with, among other things, a privileged confidential chart of shareholder distributions

and a company list identifying the various companies affiliated with American Telnet and the

shareholder percentages of each of the companies. Exhibit 14 at par. 5. The shareholder

distribution chart reflects that after 1998, the year Rivell left the company, no further

distributions were made to American Telnet shareholders. *Id.* at Exhibit D.  Instead,

shareholder distributions were made by affiliated companies which were incorporated after

Rivell left American Telnet. *Id.* and *Id.* at Exhibit C (page 4 thereto)*.*   Those affiliated

companies had the same shareholders as American Telnet with each of the shareholders having

the same percentage of ownership as they had with American Telnet with the exception that

Rivell's shares were allocated instead to Pardes and Liebowitz, thus increasing their

shareholder interests in the affiliated companies by one share each. *Id.* at Exhibit C at p. 4; *see*

Exhibit 6, excerpts of the deposition of Ted Liebowitz at p. 59.  The shareholder distribution

chart reflects that between 1999 and 2002 Carrier Network Services, Inc. (same shareholders

minus Rivell) paid out $8,500,000 in shareholder distributions;[2] Outsource Telco Billing, Inc.

---

[1] At his deposition, Liebowitz was asked the following questions and gave the following answers: "Q. Do you know whether or not certain entities were established to ensure that Mr. Rivell would not receive any distributions? A. I do not recall that. Q. Are you telling me that didn't happen or you just don't recall? A. I don't recall."  Exhibit 6 at pp. 51-52.

[2] Markowitz, American Telnet's CFO, testified at his deposition with respect to Carrier Network Services as follows: "Q. Now, what was the business of Carrier Network Services? A. To the best of my recollection, it was created so American Telnet could get better rates from the

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

(same shareholders minus Rivell) paid out $1,000,000 in shareholder distributions; IP Teleservices, Inc. (same shareholders minus Rivell) paid out $250,000 in shareholder distributions; and FlashTel, Inc. (same shareholders minus Rivell) paid out $250,000 in shareholders distributions. Exhibit 14 at Exhibit D.

17.    Another American Telnet affiliated company, FirstCall Communications, Inc. ("FirstCall"), had an involuntary bankruptcy case filed against it in 1999. In September 1999, a Rule 2004 examination was conducted of Markowitz. *See* Exhibit 15. Markowitz' testimony revealed that upon the filing of the involuntarily bankruptcy petition, FirstCall moved all of its customers to another affiliate, Interactive Call Solutions. *Id.* at p. 26-27. Interactive Call Solutions had no employees, computers, or equipment and did not own or lease any premises. *Id.* at pp. 28-32. Instead, it utilized the services of American Telnet to conduct all of its business. *Id.* at p. 29. All of the equipment previously owned by FirstCall was taken over by American Telnet. *Id.* at p. 35.[3] Markowitz claimed that transfers were made in lieu of payment for loans purportedly made by American Telnet to Interactive Call Solutions. *See* Exhibit 16, excerpts of the deposition testimony of Markowitz taken on June 17, 1999 at pp. 41, 43. Within a month, a settlement agreement was reached pursuant to which

---

carriers, and we would have carrier status which put us in the wholesale group. That's it." *See* Exhibit 11 at p. 65; *see also* Exhibit 6, excerpts of the deposition of Ted Liebowitz at pp. 56-57 ("Q. Okay. So what all of a sudden occurred, subsequent to 1998, that caused American Telnet to no longer make shareholder distributions? Was it no longer making money? A. I just don't recall. It sure looks like Carrier Network Services picked it up. Q. It sure does, doesn't it. A. It sure looks that way").

[3] There were 11,000 phone numbers that American Telnet had that were being serviced by FirstCall. *See* Exhibit 15 at p. 55. Those numbers were not transferred back to American Telnet but instead were given to Carrier Network Services for servicing. *Id. See* discussion infra concerning the American Telnet "House Numbers." Thus, a decision was made not to transfer the numbers back to American Telnet where Rivell held a 2% ownership interest but instead were sent to Carrier Network Services which had the same shareholders as American Telnet except for Rivell. *Id.* at p. 56.

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

American Telnet paid off all of the creditor claims of FirstCall.  *See* Exhibit 17.

18.     In June of 2003, American Telnet held various conferences with Akerman's lawyers, including bankruptcy counsel, Michael Goldberg, related to American Telnet's leases and debt structure.  *See* Exhibit 18.

19.     In or about September 2003, American Telnet sent phone numbers off to another service bureau, NTS, as a test to determine whether they could handle American Telnet's needs.  *See* Exhibit 6 at pp. 19-20.

20.     On October 13, 2003, the parties to the Rivell litigation held a mediation session at which time the case was resolved.  *See* Exhibit 19. Pursuant to the terms of the settlement agreement, Rivell was to be paid $270,000 and agreed to relinquish his shareholder interests in American Telnet.  *See* Exhibit 20; *see also* Exhibit 31 at par. 5.  Based on the amount paid to purchase Rivell's percentage ownership of the company, the re-purchase would value American Telnet at $13.5 million as a business enterprise.

21.     One day later, on October 14, 2003, with the settlement completed, Kahn sought the advice of Akerman concerning promissory notes, security agreements and draft UCC-1 financing statement for purported loans made by Pardes and Liebowitz to American Telnet.  *See* the cover letter and attachments which are attached as Exhibit 21.

22.     On October 16, 2003, Bernie Jacobson of Akerman emailed Kahn back advising that "the Promissory Notes, Security Agreement and UCC-1 forms for the loans to be made by Ted [Liebowitz] and Michael [Pardes] ..." were fine except for some verbiage on the bottom of the first page and the beginning of the second page which he suggested be stricken.  *See* email from Bernard Jacobson to Kahn dated October 16, 2003 which is attached as Exhibit 22; *see* Exhibit 31 at par. 6 and Exhibit B thereto.

23.     On or about October 22, 2003, a check was issued to Robert H. Cooper,

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

Rivell's lawyer, as Trustee in the amount of $270,000 to fund the Rivell settlement. A copy of the general ledger page identifying the payment is attached as Exhibit 20.

24.     The next day, on October 23, 2003, UCC-1 financing statements providing notice that Pardes and Liebowiz held security interests in all of the assets of American Telnet were filed. A true and correct copy of the UCC-1 statements are attached as composite Exhibit 23.

25.     On November 4, 2003, a final order of dismissal with prejudice was entered in the Rivell case. Exhibit 19.

26.     Having settled the Rivell litigation and having filed the UCC-1's, American Telnet next began firing its employees. On November 5, 2003, Akerman sent over a separation and release form for the termination of the company's employees. A copy of the separation and release form is attached as Exhibit 24.

27.     At or about that time, Kahn was terminated by American Telnet. *See* Exhibit 10, excerpts of Kahn deposition at p. 23 ("Q. What was the reason that you left American Telnet when you did? A. I was told my employment was terminated"). In connection with his departure, Kahn signed a release agreement with American Telnet. *See* Exhibit 25. The release agreement is dated by Kahn on November 14, 2003 but identifies that the severance payments began as of November 1, 2003. *Id.* The agreement includes personal guarantees by Pardes and Liebowitz to ensure payment of the $120,000 due under the severance agreement to Kahn. *Id.*

28.     Pardes testified in part as follows regarding Kahn's departure:

Q. Okay. And did American Telnet ask its lawyers to draft up severance agreements for its employees at or about that time [October 2003]?

A. For which employees?

Q. Just generally.

A. I believe, before we decided to close and liquidate, the only one I can remember was there was some issue with Gavin Kahn with respect to him leaving.

And we said to him why don't you stay because we really need someone to help with the liquidation and the closing of the company, and so why don't you work on some kind of part-time basis, and we'll compensate you until we close up.

\*\*\*

Q. Okay. Do you recall any conversation you had with respect to the personal [sic] guarantee between you and Mr. Kahn.

A. I said make sure you better work real hard and help us out so we can close up and, you, know, get on with our lives. So please help a lot, and make sure everything goes right.

Q. Okay. And do you recall telling him that at or about the time that you signed the person[al] guarantee?

A. No, I didn't. Before this paper was even written we talked about the concept, and what he would do.

*See* Exhibit 3, excerpts of the deposition of Pardes at pp. 100-101, 103-04. [4]

29.    Pardes further admitted that he and Liebowitz stopped receiving salary

from American Telnet in November 2003. Exhibit 1, excerpts of the deposition of Pardes

taken on June 1, 2005 at p. 68, 87-88.

---

[4] Pardes apparently then recognizing the implications of his testimony and asked for a "timeout." *Id.* at 104. The testimony provided by Pardes subsequent to his request for a "timeout" is demonstrably false and would support sanctions against the Defendants for fraud on the court. *See, e.g., Qantum Comms. Corp. v. Star Broadcasting, Inc.*, 473 F.Supp.2d 1249, 1269 (S.D. Fla. 2007) (emphasis in original) ("Those who lie, evade and fail to tell the *whole* truth obviously enjoy an advantage over honest litigants. The victimized opponent winds up, as in this case, consuming substantial resources to respond to and 'undo' the victimizer's lies and distortions....In the meantime, the Court itself is prevented from actually reaching the merits of the case-as well as resolving other cases-by having to stop and, as it has done here, exhaustively examine what is, at bottom, sanctionable perjury and fraud upon the Court"); *Vargas v. Peltz*, 901 F. Supp. 1572, 1582 (S.D. Fla. 1995) ("Litigants must know that the courts are not open to persons who would seek justice by fraudulent means"). Presumably, the Defendants will not seek to compound their sanctionable conduct by offering such testimony in response to the Trustee's motion for summary judgment.

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

30.     Liebowitz testified that the determination to close the company was made prior in time to American Telnet's obtaining the separation and release form to terminate employees and the preparation of Kahn's release. *See* Exhibit 6, excerpts of the Liebowitz deposition at pp.73-75.  Liebowitz admitted that American Telnet entered into the release agreement and the personal guarantee was made to Kahn because "I believe we were winding down the business." *Id.* at pp.  63-64.

31.     Scott Cowart, who was American Telnet's Vice President of Finance at the time he left the company in October 2003, has testified that prior to his departure there were discussions to close down the company and that "it was probably cheaper to outsource versus do it ourselves [a]nd as a result, that's what we should do." *See* Exhibit 26, excerpts of the deposition of Scott Cowart taken on December 9, 2004 at pp. 7, 12-13, and 47-48.  Mr. Cowart indicated that American Telnet was contemplating at that time "the possibility of going to NTS, the possibility of merging with NTS, the possibility of buying NTS, the possibility of NTS buying us, there were so many possibilities, you know, they kept ever changing.  But again there were other indicators telling me what was probably going to happen." *See* Exhibit 39, deposition testimony of Scott Cowart taken on June 27, 2011 at p.19.

32.     American Telnet was insolvent as of November 2003 when Pardes and Liebowitz no longer took any salaries.  *See* Exhibit 27, Pardes' interrogatory response no. 10 ("Pardes realized that the corporation was insolvent and decided to cut costs by relinquishing his salary while he assisted in winding down American Telnet"); *See* Exhibit 28, Liebowitz' interrogatory response no. 10  ("Liebowitz realized that the corporation was insolvent and decided to cut costs by relinquishing his salary while he assisted in winding down American Telnet").  In fact, American Telnet was insolvent (and certainly within the zone of insolvency)

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

prior to the funding of any purported loans that were made to the company by Pardes and

Liebowitz.  The first loans by Pardes and Liebowitz were supposedly made in August, 2003.

Pardes testified that American Telnet lost money in both 2002 and 2003, Exhibit 1 at p. 75, and

contended that the "loans" were necessary because: "Well, there's only two choices.  If it didn't

get the money, it would go out of business.  If it got the money, it had a chance to succeed, and

overcome its initial problems." Exhibit 3 at p. 24. *See also* the testimony of S. Liebowitz.

Exhibit 68 at pp. 14-15 (Liebowitz advised his wife that without a loan the business would go

into bankruptcy). Cowart, American Telnet's Vice President of Finance, testified that "solvency

in general was questioned in 2003," Exhibit 26 at p. 51, and that American Telnet was

insolvent. Exhibit 39  at p. 109.  Moreover, as demonstrated by Pardes' and Liebowitz'

testimony, on or prior to October 14, 2003,  American Telnet was in need of funds, it had to

terminate its employees because it could not afford them, and was liquidating or was

considering whether it could continue as a viable business. *See, e.g.*, Exhibit 6 at p. 75.

       33.     In or prior to October of 2003, certain IP clients of American Telnet, and

in particular the Zodiac and American Psychic, complained to American Telnet because

American Telnet was deducting from their accounts charges that belonged to other IPs and

sought explanations from American Telnet.  *See* Exhibit 26 at pp. 43-44.  In addition,

beginning in October 2003, American Telnet stopped remitting revenues owed to Zodiac and

American Psychic.  *See* Affidavit of David Felger which is attached hereto as Exhibit 29; *See*

Exhibit 43 at par. 12, 14.  In addition, as of that time, American Telnet refused to pay back the

revenues owed Zodiac and American Psychic that were being held back in a reserve account

pending reconciliation of accounts with the telephone service providers ("holdbacks"). *Id.*

Pursuant to their contracts, holdbacks were supposed to be held in a "reserve account" for some

eighteen months, with reconciliation of the amounts to be remitted back to the IPs on regular

monthly basis.  *See* Exhibit 43 at par. 10 and Exhibits 4 and 5 thereto at Section 1 (e).

34.     On December 12, 2003, certain IPs were advised that their contracts

were being terminated with American Telnet effective immediately. *see* Exhibits 29, 30 and 53.

35.     A meeting was then scheduled for December 16, 2003, among Pardes,

Liebowitz, Markowitz, the company's Chief Financial Officer, and Michael Goldberg, a

bankruptcy attorney with Akerman.  Bernie Jacobson of Akerman explained the purpose of the

meeting as follows to his colleague Oscar Sanchez:

> I had put them in touch with Mike [Goldberg] several
> moths ago to explore a possible bankruptcy route as a
> means of avoiding the Rendina lease obligation.  As I
> understood it, the bankruptcy route did not work for out
> for our clients at that time and they then proceeded on
> another course (the one we were partially involved a few
> weeks ago) to resolve the problem.  I was under the
> impression from our last conversation with Howard
> [Markowitz] that a solution had been arrived at and that
> our help was not needed.  A meeting with Mike
> [Goldberg] is obviously not consistent with that
> impression.

*See* Affidavit of Bernard Jacobson, Exhibit 31 at par. 7 and Exhibit C  thereto.[5]

36.     Within two days of that meeting, on December 18, 2003, new UCC-1

forms were filed identifying that Pardes and Liebowitz held a security interest in all of the

assets of American Telnet. *See* composite Exhibit 32.

37.     On January 21, 2004, Pardes and Liebowitz filed a lawsuit against

American Telnet alleging that American Telnet failed to pay back loans they had made to the

company just months earlier and seeking to foreclose on their security interests. *See* Exhibit 33.

38.     The complaint alleged that on or about August 8, 2003, American Telnet

---

[5] The meeting Mr. Jacobson apparently referenced from a few months back is identified
in the invoice of Akerman sent to American Telnet dated July 25, 2003.  *See* Exhibit 18.

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

executed and delivered to Liebowitz a first Promissory Note in the sum of $425,000.00 and a

Security Agreement securing payment of the Note. *Id.* at par. 10. The complaint further alleged

that on or about August 11, 2003, American Telnet executed and delivered to Pardes a second

Promissory Note in the sum of $352,000.00 and a Security Agreement securing payment of the

Note. *Id.* at par. 11.  These allegations are, of course, false because Akerman did not review

and comment on the proposed notes and security agreements until mid-October 2003.

        39.     Four additional loans, also secured by Security Agreements, were

alleged to have been made by Liebowitz and Pardes to American Telnet as follows:

- October 14, 2003 loan from Pardes in the amount of $214,500.

- October 14, 2003 loan from  Liebowitz in the amount of $291,500.

- October 22, 2003 loan from Pardes in the amount of $127,173.91

- October 22, 2003 loan from  Liebowitz in the amount of $172,825.

*Id.* at par. 12-15.

        40.     Although Pardes and Liebowitz allege in their complaint that they

entered into promissory notes respectively on August 11, 2003 and August 8, 2003, the notes

could not have been executed until Mr. Jacobson made the comments that he did on October

16, 2003. *Compare* Exhibit 33 at Exhibits 1 and 3 thereof with Exhibits 21 and 22.  The

changes suggested by Mr. Jacobson in October 2003 are incorporated in the August 2003 notes.

In addition, in August 2003, Liebowitz had not fully funded the alleged loan in the amount of

$425,000.00 (see Exhibits 34 and 35) and, in August 2003, Pardes had not fully funded the

alleged loan in the amount of $352,000.00. *See* Exhibit 35.

        41.     No board of directors meetings were ever held to approve or ratify these

alleged loans. Exhibit 3 at pp. 20-21, 24. In fact, Liebowitz has testified that did not recall any

board meetings and "the shareholders, for all intents and purposes were me and Mike Pardes.

We owned about 99 percent of the company, and we made all of the decisions." Exhibit 6 at pp. 31-32.

42.     On February 9, 2004, Michael Goldberg of Akerman (who was hired to defend the actions on the notes filed by Liebowitz and Pardes) had a conference call with Markowitz, American Telnet's CEO.  Pursuant to the instructions Goldberg received during that call, American Telnet admitted almost every single allegation of Liebowitz' and Pardes' complaint, denied none, and asserted not one single affirmative defense, despite the availability of many affirmative defenses.  *See* Exhibit 36, Affidavit of Joan Levit at par. 3 and Exhibit A thereto.  By way of example, American Telnet could have challenged these purported loans on the grounds that they were insider loans that should have been re-characterized as capital contributions, the loans were back-dated, there was a lack of consideration for the notes, the moneys allegedly loaned were returned to Pardes and Liebowitz in the form of other payments purportedly owed to them or to entities they controlled, or the loans were not enforceable because, among other reasons, no documentary stamps appear to have been paid.  Akerman was further advised during that conversation that the shareholders would be taking over the assets and that American Telnet intended to turn over its assets to Pardes and Liebowitz.  *See* notes of Joan Levit, *Id.* at Exhibit B thereto.

43.     As is reflected in a letter dated February 9, 2004, Pardes and  Liebowitz had every intention from the initiation of their suit against American Telnet to take the assets and convert them to their own use. *See* Jacobson's Affidavit, Exhibit 31, at par. 8 and Exhibit D thereto. As reflected in that letter, Pardes and Liebowitz advised American Telnet's lawyers, Akerman, that it was their intention to take over all the assets of American Telnet, tangible and intangible, and to "conduct a business similar to the business that has been conducted by [American Telnet] in the past." *Id.*

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

44.    The following day Pardes and Liebowitz filed a motion for final summary judgment .  Akerman was instructed to consent to the entry of judgment.  *See* Exhibit 36,  Declaration of Joan Levit at paragraph 4 and Exhibits C and D thereto.

45.    On or about March 1, 2004, American Telnet left the 30,000 square foot premises they had leased and failed to pay the rent due.  *See* Exhibit 37.

46.    On March 2, 2004, the order granting final summary judgment in favor of Pardes and Liebowitz against American Telnet was entered by the state court without opposition.  Judgment was entered in favor of  Liebowitz in the amount of $1,032,825.00, together with prejudgment interest in the sum of $38,945.77, court costs in the sum of $250.00 and attorney's fees of $4,471.00 for a total of $1,076,491.70, and judgment was entered in favor of Pardes in the amount of $799,673.91, together with prejudgment interest in the sum of $30,314.84, court costs in the sum of $250.00 and attorney's fees of $4,471.00 for a total of $834,709.75. *See* Exhibit 38.

47.    Immediately thereafter, Pardes and Liebowitz filed a judgment lien and sought to levy the assets of American Telnet.  *See* Exhibit 40.

48.    During the months of February and March of 2004, negotiations ensued with certain service bureaus to take over or conduct American Telnet's business. *See* Jacobson's Affidavit, Exhibit 31, at par. 9 and Exhibit E thereto and Exhibit 41.

49.    On March 7, 2004, in a conference with Liebowitz and Markowitz, among others, Akerman was advised that the telephone numbers had to moved on March 8, 2004.  *See* Jacobson's Affidavit, Exhibit 31, at par. 11 and Exhibit F thereto at p. 2.   A letter agreement was prepared for the transfer of phone numbers to NTS pending the drafting of a more formal agreement. *See* Exhibit 42.

50.    On or about March 22, 2004, Zodiac and American Psychic filed suit

Carlson & Lewittes, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

against American Telnet to recover sums due and owing to them under their contracts as well as to recover certain holdbacks that were supposed to be held in a reserve account by American Telnet. *See* Exhibit 43. Zodiac and American Psychic filed an amended complaint on or about April 6, 2004, adding a claim for injunctive relief to prevent further disposition or transfer of any holdbacks that may still have been in American Telnet's possession. *See* Exhibit 44. Zodiac and American Psychic were too late, however, as Pardes and Liebowitz had already beaten them to the punch and obtained the friendly final judgment. On or about September 7, 2004, judgments were entered in favor of Zodiac and American Psychic and against American Telnet, awarding $2,040,000.00 to Zodiac and $479,000.00 to American Psychic. *See* Composite Exhibit 45.

51.      On or about March 29, 2004, American Telnet received a copy of a complaint filed by its landlord seeking damages for unpaid rent. A copy of the complaint was sent to American Telnet's counsel on March 29, 2004. *See* Exhibit 37. The landlord's complaint was also too late as Pardes and Liebowitz had obtained the friendly final judgment earlier in the month. American Telnet instructed Akerman to oppose the relief sought by the landlord though it was recognized that American Telnet had few, if any, defenses. *See* Jacobson's Affidavit, Exhibit 31, at par. 15 and Exhibit I thereto. On September 29, 2004, a default judgment was awarded in favor of the landlord against American Telnet in the amount of $1,514,757.91.[6] *See* Exhibit 46.

52.      Another creditor, Allstate, filed suit against American Telnet alleging that American Telnet unilaterally breached the contract that was entered into between the parties on December 12, 2003. *See* Exhibit 47 at par. 46, 62. Allstate alleged in its complaint

_____

[6] Pardes failed to list this judgment on the bankruptcy schedules that he filed on behalf of American Telnet. *See* Exhibit 65.

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

that payments due December 15, 2003, January 15, 2004, February 15, 2004 and March 15, 2004 were withheld and that it suffered damages of at least $547,147.71 as a result of American Telnet's breaches. *See* Exhibit 47 at par. 24, 28, 32, 36, 43-52, and 61-68.  On or about November 5, 2004, Allstate obtained a judgment against American Telnet in the amount of $547,147.71, plus interest. *See* Exhibit 48.

        53.    A Marketing and Service Bureau Agreement was entered into between American Telnet and NTS dated as of March 29, 2004.  The executed agreement, which was signed by Ted Liebowitz on March 31, 2004 and is attached as Exhibit 49, contains numerous references to phone numbers owned by American Telnet.  *See* Exhibit 49 at page 1, 1. Introduction.[7]  The Marketing and Service Bureau Agreement provides, among other things, as follows: "Both [American Telnet] and NTS are currently engaged in the business of operating and servicing **their own** 800...and 900 pay-per-call telephone numbers," "[American Telnet] and NTS currently provide for **themselves** and their customers various billing and collection services...." and  "...NTS shall commence providing [American Telnet] and [American Telnet's] designated Information Provider customers with 800 telephone service bureau services, credit card processing, banking, risk scoring and content services...." (emphasis supplied).  The agreement further provides, *inter alia*, that  "the designated telephone numbers of [American Telnet] shall remain the exclusive property of [American Telnet] or [American Telnet's] Information Provider customers..." and  that "[American Telnet] agrees, represents and warrants [that] ... [American Telnet]  has good and marketable title to all of its property and assets in connection with this Agreement." *Id*. at pp.3, 10.  *See also* Jacobson Affidavit, Exhibit 31 at par. 14 ("I was never advised that the 'House Accounts'or 'ATN House

_____

[7] The schedules reflect that they were executed by Liebowitz on April 24, 2004. *See* Exhibit 49.

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

Accounts' were owned by anyone other than American Telnet").

54.    On or about April 7, 2004, Pardes and Liebowitz filed a motion for directed Order to Sheriff seeking to include American Telnet's Marketing and Service Bureau Agreement with NTS in the Sheriff's levy of American Telnet's assets. *See* the motion which is attached as Exhibit 50.   The motion expressly represented, among other things, that the Marketing and Service Bureau Agreement was a valuable asset of American Telnet that should be included as part of the levy. *Id.*  An order approving the motion was entered on April 8, 2004. *See* Exhibit 51.

55.    The assets of American Telnet to be sold at the Sheriff's sale were identified as follows:

> Personal computers, monitors, printers, APC smart ups 220 power backup, Cabletron Ethernet hub, Cabletron system smart switch, Cisco 7500 enclosure, Cisco 7200 router, Network peripherals 12 port switch, floppy disc 95 , 524 telephone numbers, and Marketing & Service Bureau Agreement dated 3-29-2004 between American Telnet, Inc., and Network Telephone Services, Inc., along with other various items & equipment.

*See* Exhibit 52.

56.    There is no record or evidence that any of the creditors were advised of or made aware of the pending sale. *See, e.g.,* Exhibit 53, Declaration of David Felger at par. 6.

57.    On May 19, 2004, Pardes and Liebowitz purchased the assets of American Telnet, including the Marketing and Service Bureau Agreement, for $100 and obtained a Sheriff's bill of sale. *See* Exhibit 54.  Shortly thereafter, they sought and obtained a deficiency judgment. *See* Exhibit 55.

58.    Pardes and Liebowitz established two new companies. American Pay Per Call, Inc. ("APPC") was established to collect the commission revenues received from NTS for

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

the IP clients of American Telnet that were convinced to move their processing to NTS;[8] and

Combined Pay Pre Call, Inc. ("CPPC") was established to receive the revenue from American

Telnet's phone numbers that were serviced by NTS. *See* Exhibit 31 at Exhibit J thereto; Exhibit

6 at pp. 119-20, 123-24. The CPPC phone numbers were the American Telnet "House

Account" phone numbers. Exhibit 6 at pp. 94, 131.[9] The sole business of APPC and CPPC was

---

[8] It appears that American Telnet found a persuasive way to convince the IPs move their accounts to NTS. In an email exchange between Liebowitz and one such IP, Liebowitz explained that American Telnet would only pay the outstanding amounts owed to those that switched to NTS. ("...we have a process in place to pay IP's who've moved their business away and wish to return. It is my understanding that you signed off on the ATN release waiving payment in return for us releasing your numbers. We will need you to get the numbers over to NTS before we pay your old amounts."). *See* Exhibit 56. Pardes testified that he did not know one way or the other whether American Telnet had a policy of only paying back those IPs that signed up with NTS. Exhibit 3 at p. 114.

[9] The "House Account" phone numbers were owned by American Telnet. This was confirmed by Markowitz, American Telnet's CFO, who testified a number of times during his deposition that the "House Accounts" belonged to American Telnet, including the following exchange: "Q. Okay. I have a few more follow up questions. Going back to the house accounts again. We discussed that they were obtained by carriers, abandoned by an IP or contributed by Mike and Ted. Now, regardless of how it was that they came into the house account, those numbers were all assets of American Telnet; isn't that correct? A. That was my understanding." Exhibit 11 at pp. 126, 128 ("Q. At the time that American Telnet entered into the agreement with NTS, were the house account numbers, to your understanding, assets of American Telnet? A. That's my understanding"). This was also confirmed by Scott Cowart, American Telnet's Vice President of Finance, Exhibit 39 at pp. 22-23; *see* also Marketing and Service Bureau Agreement and the Assignment of Agreement & Consent to Assignment Agreement, Exhibit 49, and paragraph 53 above; Jacobson Affidavit, Exhibit 31 at par. 14 and Exhibit E thereto; Exhibit 15 at p. 55 and footnote 3 above. *See also* the deposition testimony of Pardes from 1999 wherein he admitted that the numbers that were utilized by his company Action were leased or purchased from American Telnet. Exhibit 57, Deposition testimony of Pardes taken on July 20, 1999 at p. 16 ("Q. Does Action Communications purchase or rent nine hundred numbers or eight hundred numbers from American Telnet? A. Yes"). Any attempt by Pardes and/or Liebowitz to oppose the summary judgment motion by repeating their false testimony in this proceeding that the House Account phone numbers were not owned by American Telnet but instead were owned individually by them as part of a joint account, would constitute "sanctionable perjury and fraud upon the Court."*Qantum Comms. Corp.*, 473 F.Supp.2d at 1269. Trustee reserves the right to move for appropriate sanctions for the false testimony provided to date by Pardes and Liebowitz in this proceeding.

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

to collect the payments that were to be made by NTS under the contract between NTS and

American Telnet. *See* Exhibit 58.

      59.    On June 15, 2004, Liebowitz sent an email to Bernie Jacobson at

Akerman.  In the email, Liebowitz advising, among other things, as follows:

> As you know American Telnet has defaulted and Me and Mike are
> the owners of all the assets of ATN which we bought at auction
> several weeks ago.  **Inasmuch as we wish to sit back and collect
> annuity dollars from this point forward** I want to make sure we
> have crossed all T's and dotted all I's.  **We are in the process of
> assigning our ATN contracts with NTS to our two new
> companies (Combined Pay-Per-Call and American Pay-Per-
> Call)**

(emphasis added). *See* Exhibit 31 at Exhibit J thereto.

      60.    Two days later, on June 17, 2004, Pardes, Liebowitz, CPPC and NTS

executed an Assignment of Agreement & Consent to Assignment Agreement. *Se*e Exhibit 59.

In the assignment agreement, Pardes and Liebowitz, among other things, acknowledged that

they had acquired the Marketing and Service Bureau Agreement at the sheriff's sale on May 19,

2004, and that they were desirous of assigning all of their rights in such agreement to CPPC

(excluding the IP customers of American Telnet which instead were assigned to APPC). *Id.*

The terms of the agreement further provide that CPPC accepted the assignment from Pardes and

Liebowitz. *Id.*  Thus, it was the assignment of the Marketing and Service Bureau Agreement

which provided the mechanism for CPPC to obtain the net revenue stream from the American

Telnet House Account telephone numbers.   Pardes and Liebowitz have now admitted that

CPPC has collected $3,735,703.97 in net revenues through June 2011. *See* Exhibit 60 at the

attached schedule (Grand Total for column 6).

      61.    A nearly identical assignment agreement was entered into among Pardes,

Liebowitz, APPC and NTS on June 17, 2004 for the commissions generated by American Telnet's customers that signed on with NTS pursuant to Schedule F of the Marketing and Service Bureau Agreement. *See* Exhibit 61.  Liebowitz has admitted that APPC was established to collect the Schedule F commissions received from the IP customers of American Telnet, Exhibit 6 at p. 119, and that each and every Schedule F payment received related to the IP customers that had been customers of American Telnet.  *Id.* at p. 124.  Liebowitz testified further as follows:

Q. And it was through the foreclosure that you obtained the right to receive the payments for the schedule F commissions, isn't that correct?

A.  That sounds right.

Q. Okay. So again, when you said that you received minimal or no value as a consequence of the foreclosure that-

A. Well-

Q. Let me finish.

A. Sure

Q. -that was misleading or incorrect, was it not?

A. I guess looking at it now, closely, it was probably not the best language, albeit we were owed over $2 million dollars, so everything is relative; and, you know, we did not collect back our 2 million dollars so.

*** 

Q. So, as you sit here today, you do not know one way or the other whether or not, as a consequence of you obtaining control over ATN's assets, including the marketing and service bureau agreement, whether or not you collected more or less than 2 million dollars?

Carlson & Lewittes, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

A. As we sit here today, I do not.  I know that our loans on our books were written off by the –by our tax advisors, that that loan was appropriately taken off, and whatever revenues we got was counted as income.

*Id*. at p. 119-122.

62.      Pardes and Liebowitz have now admitted that APPC has collected $990,715.36 in net commissions through June 2011.[10]  *See* Exhibit 60 at the attached schedule (Grand Total for column 10).

63.      In addition to the amounts collected by CPPC and APPC, Pardes and Liebowitz have also collected no less than $354,964.92 in garnishment recoveries.  On or about September 30, 2004, pursuant to a final judgment of garnishment, Pardes and Liebowitz recovered $11,601.03 from Gibraltar Bank, FSB in partial satisfaction of their judgment against American Telnet.  Also on or about September 30, 2004, pursuant to a final judgment of garnishment, Pardes and Liebowitz recovered $20,382.49 from Wachovia Bank in partial satisfaction of their judgment against American Telnet. On or about October 25, 2004, pursuant to a final judgment of garnishment, Pardes and Liebowitz recovered $14,494.61 from Gibraltar Bank, FSB in partial satisfaction of their judgment against American Telnet. On or about January 25, 2005, Pardes and Liebowitz recovered $296,527.00 from City National Bank of

---

[10] Pardes testified in his deposition that the payments received by APPC were not pursuant to the Marketing and Service Bureau Agreement but rather as a consequence of he and Liebowitz acting as commissioned sales agents for NTS.  He further testified in his deposition that although he signed the Assignment of Agreement & Consent to Assignment Agreement he does not know what it means and had no intention of assigning his interests in the Marketing and Service Bureau Agreement.  Any reliance by Pardes on such testimony in opposition to the motion for summary judgment would serve as an additional basis for awarding sanctions against Pardes for fraud on the court.

Carlson & Lewittes, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

Florida in partial satisfaction of their judgment against American Telnet.[11]  The final writ of

garnishment was entered on or about February 24, 2005. On March 29, 2005, an additional

$11,987.83 was deposited to the American Telnet City National Bank account.  The following

month, $11,959.79 was removed by Pardes and Liebowitz. *See* Exhibits 62 ,63, and 64; Exhibit

6 at pp. 114-16; Exhibit 3 at pp. 62-63.

    64.    In total, through June 30, 2011, Pardes and Liebowitz have collected no

less than $5,081,384.25 from their taking of the assets of American Telnet, broken down as

follows: $3,735,703.97 in net revenues through CPPC,  $990,715.36 in net commissions from

APPC, and $354,964.92 in garnishment recoveries. *See also* Exhibit 66. [12]

    65.    Today, Pardes and Liebowitz continue to collect their "annuity dollars,"

millions of dollars remain unpaid and outstanding to the non-insider creditors of American

Telnet, including but not limited to American Psychic, Zodiac, Allstate, and Atrium Holding.  In

total, non-insider creditors of American Telnet (uncovered to date) are owed in total the

principal sum of $4,739,792.65. *See* Exhibits 45, 46, 48, 65, and 69.[13]

    66.    Although he was the President, Pardes has admitted that no arrangement

was made to pay the debts of the company as he was winding down the business and he had "no

---

[11] American Telnet opened the account to deposit these funds and then removed them one day later.

[12] Incredibly, though they now admit they received certain assets, Pardes and Liebowitz previously claimed in this proceeding that the value of the assets they received through foreclosure was minimal to none. Exhibit 6 at pp. 15-16; Exhibit 3 at pp. 50-51.

[13] With accrued interest, that sum equals more than $7.2 million. *See* Exhibit 69.  Like the landlord, it is believed that additional creditors were not advised of the pendency of this bankruptcy case.  *See, e.g.,* Exhibit 1 at pp. 50-53 (reflecting that at the time American Telnet closed down, American Telnet owed $3 million to the phone companies, owed money to the landlord, and possibly owed money to the IPs).   As such, it may well be that other creditors may seek to file proof of claims.

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

idea" what the liabilities were when American Telnet closed down and "didn't focus on it." Exhibit 1 at pp. 43-44, 73.

67.    Liebowitz and Pardes received all of the assets of American Telnet. Exhibit 1 at pp. 76-78; Exhibit 6 at pp. 117.

68.    On or about March 2, 2007 ("Petition Date"), an involuntary petition for relief under Chapter 7, Title 11 of the United States Code (the "Bankruptcy Code"), was filed against the Debtor by Zodiac, American Psychic and Allstate.

69.    On April 4, 2007, an Order for Relief was entered and Kenneth Welt was subsequently appointed as the Chapter 7 trustee.

70.    In the bankruptcy schedules prepared by Pardes, Pardes and Liebowitz are identified as holding undisputed, unsecured claims for the whole amount of their judgments without any offset or deduction having been made for the money they collected from the writs of garnishment or from the "annuity dollars" they have collected from NTS.[14] (Each also seeks $24,657.53 in purported salary amounts due to them).  *See* Exhibit 65.

71.    In the schedules, Pardes disputed the amounts set forth in the judgments claimed by Allstate, American Psychic and Zodiac and failed to list, at a minimum, the judgment obtained by the landlord, Atrium Holding. *Id.*; *see* Atrium Holdings's proof of claim which is attached as Exhibit 46.

72.    Liebowitz in this proceeding claims to have made loans to American

---

[14] The figures are actually $50 less than each of their original judgments and equal the amount of the deficiency judgment Pardes and Liebowitz obtained on June 30, 2004 after purchasing all of American Telnet's assets for $100.  A copy of the deficiency judgment is attached as Exhibit 55.  The schedules do not reflect any offset or deduction for the amounts Pardes and Liebowitz received from NTS or the garnishments.

Carlson & Lewittes, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

Telnet in the following amounts and on the following dates, although all but the first transfer was made by Worldwide and not him personally:

| Date: | Amount: | Source: |
| --- | --- | --- |
| 08/8/03 | $200,000 | Liebowitz |
| 9/12/03 | $215,000 | Worldwide |
| 9/15/03 | $ 10,000 | Worldwide |
| 10/14/03 | $200,000 | Worldwide |
| 10/23/03 | $172,825 | Worldwide |
| 10/23/03 | $ 91,000 | Worldwide |
| 11/14/03 | $144,000 | Worldwide |
| 02/13/04 | $172,340 | Worldwide [15] |

Exhibit 34. No records exist that Liebowitz ever paid Worldwide back for any of the payments it made to American Telnet.  No promissory notes or security agreements were alleged to have been prepared or entered into for the November 2003 and February 2004 loans.

73.    Pardes in this proceeding claims to have made loans to American Telnet in the following amounts and on the following dates:

| Date: | Amount: | Source: |
| --- | --- | --- |
| 08/11/03 | $172,000 | Pardes |
| 09/12/03 | $180,000 | Pardes |

----

[15] This payment was made after the foreclosure proceeding was commenced by Pardes and Liebowitz against American Telnet and Pardes and Liebowitz had filed their motion for summary judgment against American Telnet.  In addition, the money was not provided to American Telnet. Instead, the money was sent to an affiliated business, Universal Electronic Processing Inc. *See* Exhibit 67 at p. 6.

Carlson & Lewittes, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

| | | |
|---|---|---|
| 10/14/03 | $214,500 | Pardes |
| 10/22/03 | $127,173.91 | Pardes |
| 11/14/03 | $106,000 | Pardes |
| 02/13/04 | $127,660 | Pardes[16] |

Exhibit 35.  No promissory notes or security agreements were alleged to have been prepared or entered into for the November 2003 and February 2004 loans.

      74.     On the same or next day of each "loan" by Pardes and Liebowitz to American Telnet, money often in the exact or nearly the same amount was transferred from American Telnet to Pardes' and Liebowitz' companies, Action and Worldwide.  In total, for the months of August through December of 2003, Worldwide Media received $1,921,006 and Action received $871,494 from American Telnet.  *See* composite Exhibit 70 consisting of pages from American Telnet's G/L Transactions Listing for 2003 and summaries of the payments made to Worldwide and Action Communications.  If Pardes' and Liebowitz' wholly owned companies deferred the payments allegedly owed to them (as they required many of their creditors to do), there would have been no need whatsoever for the "loans" which were purportedly made to American Telnet. While Worldwide received $4,488,233 in revenue from American Telnet in 2003, *see* composite Exhibit 70, it received approximately $2 million less in 2004-- Worldwide received  $811,550 in revenue in the first 3 months of 2004  from American Telnet [composite Exhibit 71 consisting of statements of American Telnet's Segregated Account for the periord January through April 2004 and a summary of the payments made to

---

[16] This payment was made after the foreclosure proceeding was commenced by Pardes and Liebowitz against American Telnet and Pardes and Liebowitz had filed their motion for summary judgment against American Telnet.  In addition, the money was not provided to American Telnet. Instead, the money was sent to an affiliated business, Universal Electronic Processing Inc. *See* Exhibit 67 at p. 6.

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

Worldwide from that account] and approximately $1.6 million  from NTS for the other 9 months of 2004 ($2,150,689 [Exhibit 60 at Total 2004, column 3] minus $255,985.25 [Id. at Total 2004, column 7] for net revenues generated for CPPC minus $300,197.18  [Id. at Total 2004, column 11] for net commissions generated by APPC under the American Telnet contract). Similarly, while Action collected $1,936,870 in revenue from American Telnet in 2003, *see* composite Exhibit 70, it received approximately $1.1 million less in 2004-- $814,821 in revenue in 2004 from both American Telnet ($404,571 paid in first 3 months of 2004 [ Exhibit 72]) and NTS ($410,250 paid in other 9 months of 2004 [Exhibit 60, Total 2004, columns 8 and 12]). The $3.1 million in additional revenue or compensation taken by Pardes and Liebowitz in 2003 (compared to 2004) more than offset any purported loans they claim to have made to American Telnet.

75.     The fund transfers made by Pardes and Liebowitz were not made for the benefit of American Telnet and provided no benefit to American Telnet.  Rather, the transfers were made to protect Action, Pardes' company, and Worldwide, Liebowitz' company.  *See* Exhibit 6 at pp. 75-76 ("Q. So the purpose of these loans was in order to protect the interest of Action Communications and Worldwide Media, wasn't it? A. Well, certainly it was to try to protect American Telnet because they were the service bureau servicing Worldwide, Action, our joint accounts; and that's where we made our income from"). *See also, e.g.*, Exhibit 6 at p. 16.

76.     In addition, no independent, third party would have loaned the funds to American Telnet. *See* Exhibit 27 and Exhibit 28 at par. 9 ("...American Telnet was in need of financial assistance and was unable to receive assistance from any financial institution...."). Pardes claims he sought to obtain loans from banks but none of them would lend American

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

Telnet the funds. Exhibit 3 at p. 33. He claims that he went to City National Bank, where he had been banking for a long time, and it would not loan American Telnet the funds unless Pardes personally guaranteed the loan. *Id.* He also requested a loan from Gibralter Bank, where American Telnet had depository accounts, and "we got the same response, only worse." *Id.* Gibralter Bank advised him that "it wouldn't look good for the bank to lend money to an adult service provider...." *Id.* Pardes also asked Liebowitz to utilize any contacts he had with institutions and Wall Street in New York. *Id.* Pardes claims Liebowitz "tried," though he too was unsuccessful. *Id.*

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

*Attorneys for the Trustee:*

CARLSON & LEWITTES, P.A.

By: _____/s/ Ronald J. Lewittes_____

Curtis Carlson, Fla.Bar. No. 236640
Ronald J. Lewittes, Fla. Bar 52840
1200 Suntrust International Center
One Southeast Third Avenue
Miami, Florida 33131
Telephone: 305.372.9700
Facsimile: 305.372.8265
E-mail: carlson@carlson-law.net

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 14, 2011, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record listed below, in the manner specified, either via transmitting of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

> Chad Pugatch, Esq.
> Rice Pugatch Robinson & Schiller, P.A.
> 101 N.E. 3rd Avenue, Suite 1800
> Fort Lauderdale, Florida 33301
> (954) 462-8000
> (954) 462-4300 Fax

Notices of Electronic Filing generated by CM/ECF

By: _____/s/ Ronald J. Lewittes_____

CARLSON & LEWITTES, P.A.
One Southeast Third Avenue • Suite 1200 • Miami, Florida 33131 • 305.372.9700